# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANTHONY MCFARLAND, ) <br> ) <br> Plaintiff, ) <br> ) <br> ) <br> ) <br> v. ) <br> ) <br> TRICAM INDUSTRIES, INC., ) <br> ) <br> Defendant. ) | Case No. 13 C 4576 <br><br> Magistrate Judge Susan E. Cox |

## ORDER

For the reasons discussed more fully below, Plaintiff Anthony McFarland's Motion For a New Trial is denied [127].

## INTRODUCTION

This is a products liability action that was brought by Plaintiff Anthony McFarland ("Plaintiff"), alleging that, on January 12, 2012, while using a step ladder manufactured by Tricam Industries ("Defendant"), the step ladder became unhinged and fell flat, resulting in injuries to Plaintiff's face and neck. The case resulted in a three-day jury trial that ended with a verdict in favor of the Defendant. Plaintiff now moves for a new trial, arguing that: 1) the Court improperly limited Plaintiff's expert witness to testimony regarding defective design of the step ladder, and excluding testimony regarding defective manufacture, and 2) "Defense counsel's obstructive, unprofessional, and unethical conduct throughout the litigation and trial . . . should warrant a new trial to prevent the defense counsel from carrying on this behavior." (Dkt. 127 at 7.)

1

# BACKGROUND

## I. Plaintiff's Expert Witness and Manufacturing Defect Theory

Plaintiff contends that a portion of the step ladder's spreader mechanism came disengaged while Plaintiff was using the step latter, causing the ladder's legs to spread apart and the ladder to flatten out. The relevant portion of the ladder's spreader was a J-shaped piece of metal (the "J hook") that ran from one of the ladder's legs and hooked around a nodule on the other leg, thereby creating the necessary tensile force to prevent the ladder from spreading flat during use. The step ladder was designed to have a J hook with a 12 millimeter opening, but the J hook on the ladder used by Plaintiff had an opening that was approximately 20 millimeters.

Plaintiff secured Dr. Gary Hutter, P.E., Ph.D, C.S.P., as his expert witness in this matter to opine on the likely causes that led to the ladder collapsing during use. In his expert report, dated April 12, 2014, Dr. Hutter opined that the J hook disengaged while Plaintiff was using the step ladder, possibly due to a variety of design defects that rendered the step ladder unreasonably dangerous. One such design defect was a button that needed to be pushed before closing the ladder. Dr. Hutter believed that this design was dangerous, because "if a user attempts to close the ladder after use without depressing this button, the closure forces can be applied to the wire end (j hook) of the spreader, and these forces tend to 'open up' the gap in the spreader . . . hence allowing the wire end of the spreader (or gap) to become disengaged." (Dkt. 78-5 at 7-8.) Alternatively, Dr. Hutter hypothesized that a manufacturing defect caused the J hook's gap to become wider than the designed gap, which allowed the J hook to slip off the nodule too easily. (Dkt. 78-5 at 89.)

However, in their Final Pretrial Order ("PTO"), dated October 15, 2014, the parties submitted an "[a]greed short description of case to be read to jury" that stated:

> Mr. McFarland alleges that the [step ladder] is defective in design and the defect in design rendered the [step ladder] unreasonably dangerous and caused his injury.
>
> Tricam Industries, Inc. denies that the [step ladder's] design renders the ladder unreasonably dangerous and denies that the alleged design defect was the proximate cause of Mr. McFarland's injury.
>
> [Dkt. 73 at 2.]

As "contested issues of law," the parties included the following: 1) "[d]id the [step ladder] contain a defective design which rendered the ladder unreasonably dangerous," and 2) "[w]as the accident step ladder unreasonably dangerous at the time the subject stepladder left the control of Tricam Industries, Inc.?" (Dkt. 73 at 16.)

During opening statements, Plaintiff's counsel stated that the Plaintiff alleged "defective ladder design and defective manufacturing process," and informed the jury that "[t]omorrow you will hear from our engineering expert who will be able to explain in detail about what is the defective design and what is the defective manufacturing process that led to this accident." (Tr. 107:1-2, 107:7-10.) After the jury had recessed for the day, Defendant's counsel objected to Plaintiff's opening statement, arguing that Dr. Hutter should not be allowed to testify to the manufacturing defect theory because it had not been disclosed in his expert report, and was not included in the PTO. (Tr. 198:4-22.) Upon resuming trial the following morning, this Court ruled that Defendant was incorrect that Dr. Hutter had failed to include the manufacturing defect theory in his expert report, (Tr. 214:5-7), but sustained the Defendant's objection because the theory had not been included in the PTO (Tr. 230:12-15), and limited Dr. Hutter's testimony only to the issue of defective design. The Court was clear in its ruling, stating that "to the extent

3

that there is some issue about how these wires are made sort of uniformly . . . to me that's clearly within design," but that "saying that there must have been a defective wire at some point along the way . . . is an alternate theory of recovery." (Tr. 224:13-225:18.)

When Mr. Hutter took the stand, he testified that he believed there were "three reasonable ways" that the J hook's opening could have been spread from 12 millimeters to 20 millimiters. (Tr. 267:16). First, the Plaintiff could have tampered with the J hook. (Tr. 267:17-20.) Second, the J hook could become misshapen if a user attempted to close the ladder without pushing the button mechanism. (Tr. 270:3-14.) When Dr. Hutter began to explain his third theory, Defendant objected, believing that Dr. Hutter was going to wade into the manufacturing defect theory that the Court had precluded earlier that day. (Tr. 273:17-20.) The parties and Dr. Hutter were brought to chambers for a sidebar. Dr. Hutter stated that he would not only testify that the J hook was uniformly designed defectively, but also that:

> [The defect] may be from piece to piece. There is also some other inconsistency. But the J hook itself is made with this opening. And there is (sic) only three basic ways this can happen. . . But it does seem to me by deductive thinking that it is not one or two of the two most, therefore it is probably three that was provided to enter the stream of commerce. It has this opening, and this one is open enough it can come through.
>
> (Tr. 275:5-17)

In other words, Dr. Hutter sought to testify that, having ruled out intentional tampering or widening through normal use, the J hook opening must have been too wide at the time it entered "the stream of commerce," which is a manufacturing defect theory. As this Court held:

> It seems to me that the area your expert is getting into now doesn't have anything to do with the design of the J hook, it is about how the J hooks are manufactured, J hook to J hook to J hook, which I understand. I mean, it is somewhat logical to conclude that, you know, if there is no other explanation, they might be made

4

> differently. The problem is you did not disclose to the defendant that that was the theory of your case.
>
> (Tr. 282:14-21.)

Following the sidebar, the Court informed the jury that the question and answer that immediately preceded the sidebar were stricken, and that "[t]he issue of a manufacturing defect in the J hook at the time it left the factory is not before you." (Tr. 287:7-10.)

### B. Defense Counsel's Purported Misconduct

During the pretrial conference, the Plaintiff presented several motions *in limine*, seeking to preclude certain evidence, including barring reference to Plaintiff's previous automobile accidents and Plaintiff's receipt of Social Security disability benefits for a prior back injury. Chief Judge Castillo excluded any and all reference to the lawsuits that Plaintiff filed following his automobile accidents, but allowed the Defendant to ask Plaintiff about the injuries he suffered in those accidents. (Dkt. 97 at 42:7-13.) Chief Judge Castillo also ruled that "actual receipt of Social Security disability benefits" would be excluded, "but the fact that [Plaintiff] made some factual submissions claiming disability because of some back injury are just too interrelated to the injuries in this case to keep out of this case. . . . So I will allow him to be cross-examined with the fact that he made that claim prior to this accident to the extent it relates to this injury." (*Id.* at 46:14-21)

While cross-examining the Plaintiff at trial, Defense counsel had the following exchange:

> Q: As I understand your testimony, you were involved in two automobile accidents, motor vehicle accidents, is that correct?
>
> A: Yes, sir, about ten years ago.
>
> Q: And as a result of those two automobile accidents, did you make a claim for neck injuries?

5

>       [Plaintiff's counsel]:   Objection, your Honor.
>
>       The Court:     Sustained.  In chambers, please.
>
> (Tr. 139:5-11).

This Court then explained its ruling, stating that Judge Castillo had ruled "that the fact of the prior injuries, the fact of the inconsistent statement, the fact of the other medical treatment is all fair game because it tends to make the argument that the injuries or at least the extent of the injuries wasn't caused by the accident," but that "the legal process, the fact that there were lawsuits filed, the fact that there was, you know, a claim that was ruled on by Social Security, that was off limits because . . . it was prejudicial unless they were factual submissions." (Tr. 150:13-24.)

Later, Defense counsel asked Plaintiff, "[b]efore the accident involving the ladder, how did you spend your time?" (Tr. 185:9-10).  Following an objection, another sidebar was held in chambers.  Counsel explained that the question was intended to show that the Plaintiff was unemployed at the time of the accident. (Tr. 185:25-186:1.)  This Court sustained the objection, noting that the question was sufficiently open-ended to lead to testimony that would contravene Chief Judge Castillo's rulings at the pretrial conference, was irrelevant because Plaintiff was no longer seeking damages for wage loss or loss of normal life, and was outside of the scope of Plaintiff's direct examination and testimony.  (Tr. 186:6-190:16.)  Immediately after the objection was sustained, counsel ended his cross-examination of the Plaintiff.

On the morning of the last day of trial, following the jury instruction conference that was held the previous evening, Defense counsel attempted to add four additional documents to Defendant's Exhibit 36, which consisted of Plaintiff's Social Security Administration records. (Tr. at 435:13-436:21.)  Defense counsel had not confronted Plaintiff with these documents

during cross-examination, and the documents had not been discussed by counsel the night before when the parties met to discuss which exhibits were properly in evidence and would be sent back to the jury. The Plaintiff objected, and the Court sustained that objection, ruling that, in his closing argument, the Defendant could "make the arguments that you choose to make because you have evidence in the record that suggests that the plaintiff is disabled," but that adding the additional pages to Exhibit 36 would unfairly prejudice the Plaintiff. (454:7-456:9.) Closing arguments were then held, and the jury returned a verdict in favor of the Defendant.

## DISCUSSION

**I.  Federal Rule of Civil Procedure 59(a) Legal Standards**

Federal Rule of Civil Procedure 59(a) allows a court to grant a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." In the Seventh Circuit, Rule 59(a) has been interpreted to allow a new trial where "the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014). "To obtain a new trial on the grounds of an erroneous evidentiary ruling, the party must show that such a ruling . . . 'had a substantial influence over the jury, and the result reached was inconsistent with substantial justice.'" *Elrod v. Yerke*, 890 F. Supp. 2d 995, 999 (N.D. Ill. 2012) (quoting *EEOC v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2012)). Alternatively, "[t]o obtain a new trial on attorney misconduct grounds, the defendants must show both that misconduct occurred and that it prejudiced their case." *Whiting v. Westray*, 294 F.3d 943, 944 (7th Cir. 2002). "In other words, a 'new trial is warranted only if the error has a substantial and injurious effect or influence on the determination of a jury, and the result is inconsistent with substantial

justice.'" *Purtell v. Mason*, 2006 WL 2037254, at *5 (N.D. Ill. July 18, 2006) (quoting *Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 994 (7th Cir. 2005)).

II. **The Court Properly Barred Dr. Hutter from Testifying on a Manufacturing Defect Theory of Liability.**

This Court's decision to bar Dr. Hutter from testifying about the Plaintiff's manufacturing defect theory was correct and did not prejudice the Plaintiff. The Seventh Circuit has recognized that "the pretrial conference and order are a vital part of the procedural scheme created by the Federal Rules of Civil Procedure." *Gorlikowski v. Tolbert*, 52 F.3d 1439, 1443 (7th Cir. 1995). "Because the parties rely on the pretrial conference to inform them precisely what is in controversy, the pretrial order is treated as superseding the pleadings and establishes the issues to be considered at trial," and any "claim or theory not raised in the pretrial order should not be considered by the fact-finder." *Id.* at 1443-44 (quoting *Erff v. Marktton Indus., Inc.*, 781 F.2d 613, 617 (7th Cir. 1986)). In this case, the manufacturing defect theory was not included anywhere in the PTO, and the Plaintiff gave no indication during the pretrial conference that he would seek to pursue recovery based on that theory.

Plaintiff admits that this alternate theory was left out of the "short description of the case" portion of the PTO, but claims that "the context of the entirety of the case and remainder of the PTO and related submissions" demonstrate that "the issue of manufacturing/quality control defects was never abandoned." (Dkt. 172 at 12 n.3.) First, Plaintiff argues that he filed a motion to compel discovery pertaining to the manufacturing defect claim during litigation. However, simply seeking discovery on relevant potential theories does not mean that those theories were properly preserved in the pretrial order. Indeed, the pretrial order supersedes any previous pleadings and serves to narrow the issues at trial. Thus, any previous theories that may have

8

been explored by Plaintiff that were not raised in the PTO were waived and could not properly be raised at trial without prejudice to the Defendant.

The Plaintiff next contends that the other portions of the PTO, its exhibits, and various motions *in limine* should have clued the Defendant into the fact that the manufacturing defect theory was still alive and would be pursued by the Plaintiff at trial. The Court disagrees that much of these submissions and stipulations would have been "pointless without the issue of manufacturing." For example, the fact that the parties stipulated that the J hook opening was designed to be 12 millimeters, and the ladder used by Plaintiff had an opening approximately 20 millimeters was necessary to explore the possibility that Plaintiff had widened the opening through improper use, which does not bear on a manufacturing defect whatsoever. Similarly, the contested matter of law asking whether "the accident stepladder [was] unreasonably dangerous at the time the subject stepladder left the control of [Defendant]" does not necessarily indicate that a manufacturing defect theory would be proffered at trial. If the ladder's design was defective, it would have left the Defendant in an unreasonably dangerous condition. Instead, this contested issue of law could be interpreted as seeking to determine whether Plaintiff had altered or misused the ladder in a way that would render it dangerous after it had left the Defendant's control.

Moreover, the fact that certain proposed exhibits or jury instructions suggested that the Plaintiff would pursue a manufacturing defect theory at trial does not relieve the Plaintiff of the duty to clearly, concisely and plainly articulate his theory of the case in the appropriate place in the PTO, namely, the "short description of the case." It is not the responsibility of this Court or opposing counsel to try and piece together all potential theories of the case from scattered and opaque fragments in the PTO when the Plaintiff could have, and indeed should have, simply stated all theories of liability in the agreed description of the case. By failing to do so, the

Plaintiff waived his right to raise the manufacturing defect theory at trial, and barring the Plaintiff from presenting that theory was not an erroneous evidentiary decision.

Finally, the Plaintiff's assertion that this Court's ruling was erroneous because Plaintiff "gained exact clarification" for the parameters of Dr. Hutter's testimony before he took the stand, relayed those parameters to Dr. Hutter, and then was prevented from having Dr. Hutter testify to the condition of the ladder when it left the factory essentially blames the Court for Plaintiff's counsel's misunderstanding of this Court's ruling. The ruling was clear – Dr. Hutter could testify regarding design defects, but could not testify that the J hook had a manufacturing defect. By attempting to testify regarding the uniformity, or lack thereof, of the J hook on the ladder used by Plaintiff, Dr. Hutter was unequivocally crossing the line into manufacturing defects, which was plainly barred. It was Plaintiff's counsel's duty to ensure that the expert witness did not stray into theories that had been excluded by the Court, and this Court's ruling that the question and answer regarding manufacturing defects should be stricken from the record was not erroneous. Therefore, the Plaintiff has failed to prove the threshold issue of an erroneous evidentiary ruling, and his argument that this Court erred by excluding Dr. Hutter's testimony on a manufacturing design theory fails.

### III. Plaintiff was not Prejudiced by Defense Counsel's Purported Misconduct

Plaintiff has failed to show how defense counsel's purported misconduct caused him to suffer prejudice that would warrant a new trial. First, the Plaintiff argues that he should be granted a new trial because "defense counsel attempt[ed] to backdoor in Social Security Disability records despite both the motion *in limine* ruling, and this Court's ruling regarding the review of exhibits the night before." (Dkt. 127 at 8). However, the Court *sustained* the Plaintiff's objections, ruled that the exhibits could not be admitted into evidence, and all of these

arguments were held in open court while the jury was out. Plaintiff has failed to articulate how this alleged misconduct prejudiced his case, as this Court granted the relief that Plaintiff sought at trial and outside the presence of the jury.

Next, Plaintiff argues that certain actions taken in front of the jury caused "irreparable harm" to Plaintiff's case. (Dkt. 127 at 9.) Specifically, Plaintiff points to the line of questioning regarding claims Plaintiff made for neck injuries, and the questions regarding Plaintiff's employment. As noted above, the Plaintiff objected in both instances, and those objections were sustained. Recognizing that the rulings themselves did not prejudice the Plaintiff, he instead asserts that having to object in front of the jury "gave the illusion that plaintiff had something to hide." (Dkt. 127 at 10.) However, the Court specifically instructed the jury to disregard any evidence to which an objection is sustained, and that any time an objection to a question is sustained to "ignore the question and don't guess what the answer might have been." (Tr. 98:21-99:15.) Thus instructed, the jury is presumed to have followed the Court's instructions. *See, e.g., Sanchez v. City of Chicago*, 700 F.3d 919, 932 (7th Cir. 2012). Without more, simply making objections that were sustained in front of a jury that was instructed to disregard such questions and any stricken answers does not warrant a new trial.

Finally, Plaintiff argues that "defense counsel's tactics resulted in an entire theory of the case being kept out – the manufacturing/quality control defects." According to the Plaintiff, that "ruling may have been fair on its face," but "it was defense counsel's improper tactics that led to [that ruling]." (Dkt. 127 at 10-11.) This is false. It was not defense counsel's fault that Plaintiff failed to include the manufacturing defect theory in the PTO, which was the basis for this Court's ruling. Nor is it true, contrary to Plaintiff's contention in his brief in support of the instant motion, that Defendant's argument switched from a failure to disclose the theory in

11

Plaintiff's expert report to a failure to include it in the PTO between the first and second day of trial. (See Tr. 198:20-22 (defense counsel arguing on first day of trial that manufacturing defect argument should not be allowed "given the scope of the pretrial order and the scope of the disclosure pursuant to Rule 26(a)(2)(B)")). The record clearly shows that both arguments were presented to this Court, the Court rejected the notice argument, but sustained the Defendant's objection based on Plaintiff's failure to include that theory in the PTO. The Plaintiff does not, and indeed cannot, argue that this failure was caused by defense counsel. To the extent that Plaintiff is arguing that the manufacturing defect theory was, in fact, included in the PTO, that argument also fails for the reasons outlined above. As such, defense counsel's actions at trial did not result in the manufacturing design theory being excluded, and Plaintiff was not prejudiced.

Therefore, Plaintiff has failed to show how defense counsel's supposed misconduct caused him sufficient prejudice to warrant a new trial, and Plaintiff's motion is denied on this ground.

## CONCLUSION

For the foregoing reasons, Plaintiff Anthony McFarland's Motion For a New Trial is denied [127].

It is so ordered.

**ENTER:**
**DATED:** May 28, 2015

Susan E. Cox
United States Magistrate Judge